THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
DONALD PURCHASE, Defendant-Appellee.

Third District   No. 3—90—0568

Opinion filed April 4, 1991.

Raymond Kimbell III, State's Attorney, of Galesburg (Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Thomas C. Maas, of Baudino, Potter & Maas, of Farmington, for appellee.

PRESIDING JUSTICE STOUDER delivered the opinion of the court:

The defendant, Donald Purchase, was charged with five counts of theft (Ill. Rev. Stat. 1989, ch. 38, par. 16—1(a)). The trial court thereafter granted the defendant's motion to suppress all evidence seized during a search of his residence. The State appeals, arguing that the trial

court erred in determining that the consents obtained from the defendant and his wife were not voluntarily given.

At the hearing on the motion to suppress, the defendant's wife, Luanna Purchase, testified that around 9:30 a.m. on March 7, 1990, she was home alone when two police officers came to her door. With her permission, they entered the house and told her they were investigating thefts which had occurred at a Farm King store. When Luanna denied knowing anything about the thefts, one of the officers noted that she was pregnant and told her that if she did not cooperate they would put her in jail and take custody of her baby. The officer then asked her to sign a piece of paper. When she asked what it was, he merely stated that it showed her cooperation. Believing the police could take her baby, Luanna signed the paper. The officer covered the top part of the document so she could not read it.

Luanna also testified that the officers led her to believe that they had a valid search warrant. After being joined by three other officers and Luanna's ex-stepfather, the police searched the house until 6 or 6:30 that evening. Luanna noted that she did not know she could call an attorney or withdraw her consent. She further stated that had she understood her rights, she would not have signed the consent to search form at least until her husband got home.

Luanna's mother testified that on March 7 she arrived at the defendant's home around 11 a.m. Upon entering the house, she saw two men in the laundry room and another man in the kitchen. Luanna appeared very upset. When her mother learned what was occurring, she asked whether Luanna had called a lawyer. Luanna said she had not, explaining that the officers had told her that if she cooperated everything would be fine, but if she did not they would take her to jail and make the baby a ward of the court. Luanna's mother further testified that, when she asked to see a search warrant, the officer in the kitchen told her the other officers had it. She thereafter left. When she returned around 4 p.m., the police were still searching the house and Luanna was still upset.

The defendant testified that his wife called him at work on March 7. He returned her call between 10:30 and 11 a.m. Upon learning what was happening, he drove home, arriving there between 11 and 11:30 a.m. The defendant talked with three officers, noting that they were polite and accommodating. His wife appeared nervous and scared, and told him that the police had said they could take her to jail and make the baby a ward of the court. The officers then explained to him why they could do that. Though he asked to see their search warrant, they never showed him one, even though one officer claimed they had a warrant.

Throughout this time, the search continued and did not terminate until around 7 p.m. At some points, the defendant helped the police move seized items into a truck.

The defendant further testified that approximately two or three hours after he arrived home, the police asked him to sign a form. He initially said he would not sign it without reading it. The officers nonetheless kept the top part covered and told him that it merely showed he was cooperating. At one point during the conversation, his wife interrupted and said that she was not given a choice but was told that she could either sign the form or be taken to jail and lose her baby. The defendant testified that he eventually signed the form after being told he had to and being led to believe it merely showed he was cooperating. The form indicated that it was signed at 1:55 p.m.

The defendant and the State stipulated that the police officers did not possess a search warrant. Further, they did not have an arrest warrant for the defendant or his wife.

Illinois State Police special agent Kenneth Kedzior testified that the defendant was a suspect in thefts from a Farm King store. On March 7, he and two other officers went to the defendant's home around 10 a.m. They told Luanna why they were there and, after being let in the house, advised her of her constitutional rights. After Luanna told them that none of the stolen items would be found in her house, they asked her for consent to search the house. When she agreed orally, Agent Kedzior completed a consent to search form and asked her to sign it. Before she signed it, Luanna was told that it was a consent to search form and that she did not have to sign it. Further, she read the document before signing it. Agent Kedzior stated that neither he nor either of the other two officers ever told Luanna that if she refused to sign the form they could make her baby a ward of the court. He noted that she did not appear to be upset at any time. He further noted that she was never told that the officers had a search warrant.

According to Agent Kedzior, the defendant arrived at the residence around 1:30 p.m. He thereafter denied any involvement in the thefts and signed a consent to search form. Before the defendant signed the form, Kedzior told him it was a consent to search form and left the document in full view. Agent Kedzior testified that the search ended around 6 p.m.

Agent Lance Adams, who also participated in the search, testified to essentially the same facts as Agent Kedzior.

The trial court found that Luanna was in a very coercive and duressful environment when she signed the consent form. It further found that the police created the impression they had a search warrant

and that Luanna had no choice but to sign the form. The court concluded that Luanna had not understood the nature of the consent form when she signed it and had not done so voluntarily. Similarly, the court found the defendant's testimony more credible than the officers.' Of particular importance, the court concluded that the defendant was home for a couple of hours before the officers thought about getting his consent for the search. The court therefore found that since Luanna's consent was invalid and the defendant's consent was not gained until hours into the search, the search was tainted and that taint continued throughout the entire search. Finally, the court specifically found that under the circumstances the defendant's consent was also involuntary.

On appeal, the State argues that the trial court erred in determining that the consents obtained from the defendant and his wife were not voluntarily given.

For a consent to have been voluntarily given, the consentor must have been under no duress or coercion, actual or implied, and the consent must have been unequivocal, specific, and freely and intelligently given. (*People v. Lee* (1981), 93 Ill. App. 3d 894, 417 N.E.2d 1090.) In determining the voluntariness of the consent, questions involving the witnesses' credibility and the weight to be given their testimony are left largely to the discretion of the trial court. (*People v. Branham* (1985), 137 Ill. App. 3d 896, 484 N.E.2d 1226.) Since the voluntariness of a consent is a factual question, the trial court's finding will be upheld unless it is found to be manifestly erroneous. *People v. Koniecki* (1985), 135 Ill. App. 3d 394, 481 N.E.2d 973.

In its brief, the State presents a lengthy, piece-by-piece analysis of the witnesses' testimony and the trial judge's findings. By taking statements out of context and exaggerating the importance of minor discrepancies, it attempts to show that the judge's findings were contradictory and his decision was unreasonable. We find its position unpersuasive. This case presents a simple issue of whether the defendant's or the State's witnesses were more credible. Based on considerable evidence from the defense that the two consents were obtained through coercion and trickery, the court found that the consents were not voluntary. Under these circumstances, we find that its decision was not manifestly erroneous.

The judgment of the circuit court of Knox County is affirmed.

Affirmed.

BARRY and GORMAN, JJ., concur.