2021 IL App (2d) 190603-U
No. 2-19-0603
Order filed June 23, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14-CF-1921 |
| | ) | |
| THOMAS A. BENAVIDEZ, | ) | Honorable |
| | ) | Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hudson and Birkett concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant's consent to a search of his home was voluntary despite the officers' prior entry into the home. That entry was justified because defendant's wife needed to check on the young children in the home, and the officers needed to make sure that defendant's wife would not hide or destroy the contraband that defendant had admitted was in the home.

¶ 2     Following a stipulated bench trial, defendant, Thomas A. Benavidez, was convicted of possession with the intent to deliver more than 2000 grams but not more than 5000 grams of any substance containing cannabis (720 ILCS 550/5(f) (West 2014)). He appeals, contending that the trial court erred by denying his motion to suppress evidence found during a search of his home.

He argues that, although he ostensibly consented to the search, that consent was involuntary where the police had already begun illegally searching the home. We affirm, holding that the trial court did not err in finding that defendant's consent to search was valid.

¶ 3                                   I. BACKGROUND

¶ 4     Defendant was charged after Kane County sheriff's deputies found cannabis in his truck after a traffic stop and later found a larger amount in his home. Defendant moved to suppress the evidence. His motion argued that there were no grounds for the traffic stop, that the subsequent search of the truck was not based on probable cause, and that defendant's consent to search his home was involuntary.

¶ 5     The following evidence was adduced at a hearing on the motion. Defendant testified that, on November 20, 2014, he visited his friend Jason Williams at his house in the Valley View subdivision in unincorporated Kane County. Defendant gave Williams a bag of cannabis. They "chatted for a little a bit," and defendant left in his Honda Ridgeline.

¶ 6     However, the Kane County Sheriff's Department had received an anonymous tip about Williams and had his home under surveillance. As defendant drove away, two marked Kane County sheriff's vehicles followed him. The deputies pulled defendant over as he turned onto Red Gate Road.

¶ 7     Then-Sergeant Ron Hain testified that he paced defendant's vehicle to gauge its speed and found that it was traveling 54 miles per hour in a 45-mile-per-hour zone. He initiated a traffic stop, approached defendant's vehicle, and obtained his license and insurance information. Hain testified that he could smell burnt cannabis in the vehicle. He ordered defendant out of the vehicle and searched his pockets, finding cash and a cell phone. He then searched the vehicle, where he found a bag of cannabis.

¶ 8    The deputies initially believed that defendant had bought cannabis from Williams. However, they gradually began to suspect that defendant was Williams' supplier. In any event, Hain put defendant in the back of his squad car and drove to Williams' house, where a search was in progress. Deputies found cannabis in Williams' house, and Williams gave a statement implicating defendant. Defendant then admitted to Hain that he had cannabis at his house. Defendant testified that he was handcuffed at this point. Hain testified that he was not.

¶ 9    Hain then started driving toward defendant's house. During the trip, Hain repeatedly asked defendant whether he would consent to a search of his house. According to Hain, defendant never definitively said that he would not consent, but said that he wanted to consult with his wife first. Defendant testified, however, that he explicitly refused consent.

¶ 10    Deputies Terrance Hoffman and Justin Douglas also drove to defendant's home. Upon arrival, they went to the house and returned with defendant's wife, Andrea. Hain opened the door of the squad car so that defendant and Andrea could talk. The deputies gave them some "space" and were not actively listening to the conversation. However, defendant and Andrea asked several questions.

¶ 11    At this point, the various accounts of the incident diverge somewhat and we summarize them as follows. Hain testified that defendant asked him what would happen if he would not consent to a search. Hain replied that he would get a search warrant. Defendant and Andrea were taking a long time to decide, conversing for as long as 15 minutes. Because they were taking so long, Hain began filling out an application for a search warrant.

¶ 12    Hain was concerned because Andrea had young children in the house and the deputies had information that drugs were also in the house. Accordingly, Hoffman and Douglas went with Andrea into the foyer of the house "to check on the kids and to make sure there was nobody else—

no other adults in the house potentially destroying evidence." The three were just inside the home when defendant said that he would sign a consent to search. Defendant then signed the form.

¶ 13    On redirect examination, Hain reiterated that the deputies returned to the house with Andrea to check on the children and ensure that there were no other adults present who could be destroying evidence. Hain said that he made clear to defendant the purpose of the deputies' entry.

¶ 14    Defendant, however, testified that he again explicitly refused consent, telling the deputies that they would need to get a warrant. Defendant testified that Hain asked him if he were "sure" he would not consent to a search. According to defendant, Hain told him that if he consented the deputies would not disturb his children, turn his house "upside-down", or arrest him that night.

¶ 15    Defendant heard a deputy tell Andrea that she would have to remove her children from the house. Andrea entered through the garage door, which defendant found odd since the front door was open. He then saw the deputies going through her car. He ultimately signed a consent form because, he said, "you guys are already inside the house." He estimated that the deputies had been in the house for between three and five minutes at that point.

¶ 16    Hoffman testified that he overheard defendant say that the deputies would need to get a warrant. At that point, Hain began to type up a search warrant application. Hoffman advised Andrea that they would need to walk through the residence with her to verify that no other adults were present who could destroy evidence. He, Douglas, and Andrea entered through the front door. They were still in the foyer, within five feet of the front door, when Hain notified them that defendant had signed a consent form. Defendant then walked to the basement and unlocked a storage area in which the deputies found cannabis, drug paraphernalia, digital scales, a money counter, and packaging material.

¶ 17    Andrea testified that she and defendant informed the deputies that they could not search without a warrant. The deputies informed her that she would have to leave the premises with her children. Hain told her that she would have to open the garage, so she opened the garage door. The deputies said that they needed to search her car before she could leave with the children. She agreed, and the deputies searched the car. She then went into the house accompanied by three deputies. One or two went toward the kitchen and one moved toward the living room. After 10 to 15 minutes, the deputies informed her that her husband had given them consent to search.

¶ 18    At the conclusion of the evidence, the parties argued their respective positions. At the end of defense counsel's argument, the following colloquy occurred:

"THE COURT: Do you agree–let's go to the house.

Let's assume I find everything for argument's sake and we go to the house.

MR. DIXON [(DEFENSE COUNSEL)]: Okay.

THE COURT: Do you agree that, taking the facts as the State has them, that Hain said, fine, you know, we just want to—we're going to get a search warrant basically and sent two police officers out to do a sweep of the house. Is the sweep, although they don't do a complete sweep, I know, but actually going to do a sweep of the house before the warrant is executed, do you agree that that is acceptable practice or is that illegal?

MR. DIXON: Your Honor, I think they could do the sweep. I think, quite frankly, the practice is that they keep them out of the house.

THE COURT: Which they already.

MR. DIXON: Which they already are. If they're allowing her to go back in—

THE COURT: Well, all we know is the wife and husband. We don't know who else is in the house.

MR. DIXON: Right. We don't know who else is in the house. I think at that point you're not doing a sweep of the house because people are outside of the house. There's nobody there to destroy the evidence that they're aware of. They haven't gone in there. So I don't think they can go in to find out if there's somebody in there that could destroy the evidence without a warrant and without consent."

¶ 19 The trial court denied the motion to suppress. The court specifically found that Hain had reasonable grounds for the traffic stop, that the odor of burnt cannabis gave Hain probable cause to search defendant's vehicle, and that defendant's consent to search his home was voluntary, not the result of threats or coercion. The court determined that defendant was not handcuffed when he gave consent.

¶ 20 The matter proceeded to a stipulated bench trial. The parties stipulated to (1) the testimony adduced at the suppression hearing, (2) Williams' statement that defendant had given him a half-pound of cannabis, (3) pictures of the evidence recovered from defendant's home, and (4) the results of forensic testing showing that a bag recovered from defendant's truck contained 27.5 grams of cannabis and those bags recovered from defendant's home contained 2660 grams of cannabis.

¶ 21 The court found defendant guilty of possession with the intent to deliver 2000 grams or more but not more than 5000 grams of cannabis. The court sentenced defendant to court supervision. Defendant filed a posttrial motion, arguing that the court erred in denying his motion to suppress. The court denied the motion, and defendant timely appealed.

¶ 22                                II. ANALYSIS

¶ 23 On appeal, defendant argues that the deputies' entry into the house with Andrea was itself an illegal entry and search. He further contends that this illegal entry and search, coupled with

additional circumstances, rendered his consent to search involuntary. The State responds that the entry was valid either due to exigent circumstances or as a "protective sweep" and that, under the totality of the circumstances, defendant's consent was valid.

¶ 24     Before turning to the merits, we consider some preliminary matters. Initially, we note that the issue defendant raises on appeal is different from those he raised in the trial court. The motion to suppress and the written arguments submitted in defendant's supporting memorandum focused on the validity of the initial traffic stop and the subsequent search of defendant's vehicle. The motion further contended that defendant's consent to search his home was involuntary due to the length of time he was detained, Hain's repeated attempt to convince him to consent, and the perceived threat to ransack his house and arrest him if he refused. Not until the trial court raised the issue did defendant argue that the deputies' prior entry was illegal or that the entry tainted his consent.

¶ 25     Defendant did testify that he told Hain that he would just sign "because you guys are already inside," and defense counsel did point out in oral argument that defendant signed the consent after the deputies were already in the house. Under these circumstances, we do not find the issue forfeited but note that, because the issue was not extensively litigated below, the pertinent record is somewhat sparse.

¶ 26     The State argues that defense counsel's statement that "they could do the sweep" forfeited the issue under the doctrine of invited error. See *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) (party cannot complain of error to which that party consented). We disagree that the issue was forfeited, given counsel's subsequent clarification that he was challenging the legality of the deputies' entry with Andrea.

¶ 27　The parties devote considerable effort to arguing whether the deputies' entry was illegal, analyzing their conduct in terms of various labels such as "exigent circumstances" and "protective sweep." We emphasize that the issue is only relevant to the extent that it may have vitiated defendant's content. There was no evidence that the deputies discovered anything incriminating before defendant signed the consent form. Moreover, we remain mindful that the touchstone of a fourth amendment analysis "is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (quoting *Terry v. Ohio,* 392 U.S. 1, 19 (1968)). Thus, our focus is not on a specific rationale for the deputies' actions but on whether their conduct was reasonable under the circumstances.

¶ 28　Turning to the merits, defendant contends that the deputies' entry was not authorized by exigent circumstances or as a "protective sweep." The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. This generally requires a warrant supported by probable cause. *People v. Anthony*, 198 Ill. 2d 194, 201-02 (2001). The warrant requirement is, however, subject to exceptions that are " 'few in number and carefully delineated.' " *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 318 (1972)).

¶ 29　One such exception is the existence of exigent circumstances. Such circumstances have been found in only a few types of situations, including the hot pursuit of a fleeing felon, a threat to the officers' safety, and the potential destruction of evidence. *Id.* at 749-50. "If the destruction of narcotics is the primary motivation for the warrantless entry, the police 'must have particular reasons to believe that the evidence will be destroyed' before exigent circumstances will arise."

*People v. Hassan*, 253 Ill. App. 3d 558, 572 (1993) (quoting *People v. Patrick*, 93 Ill. App. 3d 830, 833 (1981)).

¶ 30    A protective sweep is another exception to the warrant requirement. *Maryland v. Buie*, 494 U.S. 325, 331-33 (1990). A protective sweep is a quick and limited search of premises, typically incident to an arrest, conducted to protect the safety of police or others and narrowly confined to a cursory visual inspection of places where a person might be hiding. *Id.* at 327. A sweep lasts only so long as necessary to dispel the reasonable suspicion of danger. *Id.* at 335-36. As with exigent circumstances based on the potential destruction of evidence, the officers must be able to articulate specific facts leading them to believe that someone was present who posed a threat either to the officers or to the evidence. *Hassan*, 253 Ill. App. 3d at 573.[1]

¶ 31    Defendant argues that such specific facts were lacking to support either exception when the deputies arrived at his house. He reasons that the only other adult in the house was Andrea. Defendant had been confined in the back of Hain's car, so he would have been unable to alert her that deputies were on their way intent on searching the house. Thus, she would have no reason to attempt to destroy the evidence.

¶ 32    This is true so far as it goes. However, the situation had changed by the time the deputies entered the house. After Andrea came outside and talked with defendant, she unquestionably knew

---

[1] A protective sweep, as defined by *Buie*, refers to a search incident to arrest to look for other occupants of the premises who might seek to harm the officers or others. See *Buie*, 494 U.S. at 326. Witnesses at the hearing on the suppression motion appeared to refer to a protective sweep somewhat imprecisely as more akin to a search based on exigent circumstances to prevent the destruction of evidence. Defendant's brief appears to use the terms interchangeably.

that the deputies had detained her husband, that they were planning to search the house (either via consent or by obtaining a warrant) and that her husband did not want the house searched. She thus undoubtedly had, at that point, a motive to attempt to hide or destroy the evidence.[2]

¶ 33    Moreover, once Andrea went outside, her children, ages one and three, were left alone inside. Hain testified that one rationale for the deputies entering the house with Andrea was to "check on" the children. Andrea testified that she was told that she had to remove the children from the house. In either case, as a matter of common sense, children that young could not simply be left inside the house unattended while the police sought and executed a search warrant. And allowing Andrea to go back inside unescorted would have invited the destruction of the evidence.

¶ 34    In *Illinois v. McArthur*, 531 U.S. 330, 331-32 (2001), the Supreme Court held that the police acted reasonably in refusing to allow the defendant to enter his home without police accompaniment while the officers obtained a warrant. There, the defendant's wife asked two officers to accompany her while she removed her belongings from the defendant's trailer. When she had finished, she informed the officers that the defendant " 'had dope in there.' " *Id.* at 329. When the defendant refused to consent to a search, one of the officers went with the defendant's wife to get a search warrant. The other officer, Assistant Chief John Love, told the defendant that he could not reenter the trailer unless an officer accompanied him. The defendant subsequently

---

[2] In his reply brief, defendant insists that even this degree of specificity was not enough. The *Buie* court equated the protective sweep with a *Terry* stop, which requires only a reasonable, articulable suspicion that the suspect is engaged or about to engage in criminal activity, not proof beyond a reasonable doubt. *Buie*, 494 U.S. at 333 (citing *Terry v. Ohio*, 468 U.S. 1 (1968)).

returned to the trailer two or three times to get cigarettes and make phone calls. Each time, Love stood just inside the door to observe him. *Id.*

¶ 35 The police ultimately obtained a search warrant and discovered marijuana and drug paraphernalia. *Id.* The trial court granted the defendant's motion to suppress that evidence. The court held that the evidence was obtained as a result of the defendant's unlawful seizure in not being allowed to enter the trailer unaccompanied, which would have allowed him to destroy the marijuana before the police found it. The appellate court affirmed. *People v. McArthur*, 304 Ill. App. 3d 395 (1999).

¶ 36 The Supreme Court, however, found that refusing to allow the defendant to reenter the trailer without a police escort was a reasonable restriction. *Illinois v. McArthur*, 531 U.S. at 331-32. The Court noted that the wife's recent observation of drugs in the trailer gave the police probable cause to obtain a warrant. *Id.* The Court further noted that the restriction was necessary to prevent the evidence from being destroyed. According to the Court, the officers "could have concluded that McArthur, consequently suspecting an imminent search, would, if given the chance, get rid of the drugs fast." *Id.* at 332.

¶ 37 The Court relied on *Segura v. United States*, 468 U.S. 796 (1984), in which the police seized drugs after executing a search warrant at an apartment, but only after unlawfully entering the apartment and occupying it for 19 hours. A majority of the Court held that the drugs were admissible because they would inevitably have been discovered pursuant to the warrant. The dissenters disagreed, but in describing alternative search and seizure methods, both the majority and the dissent assumed that the officers could have legally sealed the apartment from the outside by restricting entry while waiting for the warrant. *McArthur v. Illinois*, 531 U.S. at 333-34 (citing *Segura*, 468 U.S. at 814, 824 n.15).

¶ 38    The situation here was similar to that in *McArthur*. Based on their observations of defendant's visit with Williams, Williams' statement, the cannabis found in defendant's car, and defendant's admission, the deputies had probable cause to believe that defendant had cannabis in his house. Accordingly, it was reasonable for them to secure the premises by not allowing defendant or Andrea in without a police escort.

¶ 39    Nor is a different result warranted merely because, unlike in *McArthur*, the primary impetus for Andrea's return to the house seems to have come from the deputies themselves rather than from defendant or Andrea. The deputies could have lawfully secured the house by removing the occupants. This included the children, who, in any event, could not simply have been left in the home unattended while the deputies secured and executed a search warrant.

¶ 40    There was no evidence that the deputies used the occasion as a pretext to conduct a general search. Hoffman testified that he and Douglas remained in the home's foyer until defendant signed the consent. Even crediting Andrea's testimony, one or two deputies ventured into the adjacent kitchen and one may have started toward the living room.[3] Moreover, the deputies did not find anything incriminating during this initial entry.

¶ 41    *Vale v. Louisiana*, 399 U.S. 30 (1970), which defendant cites, is dissimilar. There, after arresting the defendant outside his home, officers announced that they were simply going to search the house. *Id.* at 32-33. The Court found that this was not a valid search incident to arrest given that the defendant was not in the house when he was arrested, and the officers had already satisfied themselves that no one else was inside. *Id.* at 34.

¶ 42    Defendant contends that it does not matter if the deputies' entry was reasonable, and thus constitutional, because "[their] conduct communicated to the defendant that they were searching

---

[3] The identity of the third officer Andrea referred to is not clear from the record.

his house with or without his consent." "Under that circumstance, the defendant's consent was clearly acquiescence to the officers' apparent authority." We disagree.

¶ 43    Defendant specifically asked Hain what would happen if defendant declined to consent, and Hain said that he would apply for a warrant. And Hain specifically testified that he told defendant the reasons for the deputies' initial entry into the house, which included having Andrea check on the children. Defendant could not simply assume that the deputies lied and that, having repeatedly asked him for consent, allowed him to confer with Andrea, answered their questions, and assured defendant that they would apply for a warrant if he did not consent, they would suddenly change course and decide to search the house *sans* warrant anyway.

¶ 44    Defendant further contends that the deputies deliberately created the situation that the State claims justified the entry. He contends that, if there was a risk that a person inside the house would destroy evidence, "it was because the officers alerted that person by placing themselves outside the house without having a warrant or consent to enter it." Defendant argues that "Hain could have sought a search warrant for the defendant's house at the time of the arrest." Defendant thus concedes that the deputies had ample probable cause to procure a warrant at that time. Unsurprisingly, defendant cites no authority for his novel contentions that the officers needed permission to wait on a public street *outside* defendant's house while they sought permission (either via a warrant or consent) to search *inside*, or that the officers were obligated to seek a warrant at the earliest opportunity. See *Hoffa v. United States*, 385 U.S. 293, 310 (1966) ("Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause.")

¶ 45    Defendant ultimately contends that, regardless of the legality of the deputies' initial entry, the totality of the circumstances demonstrated that his consent was tainted. He argues that they

held him in custody for hours, repeatedly asked for his consent to search, implicitly threatened to ransack the house, remove his children, and immediately arrest him if he did not consent, and then entered the house without his consent anyway.

¶ 46 A search conducted with a defendant's valid consent but without a warrant does not violate the fourth amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *Anthony*, 198 Ill. 2d 194 at 202. The validity of a consent search depends on the voluntariness of the consent. *Anthony*, 198 Ill. 2d at 202. Consent must be received, not extracted "by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228. The voluntariness of the consent is a question of fact based on the totality of the circumstances, and the State bears the burden of proving that the consent was truly voluntary. *Anthony*, 198 Ill. 2d at 202. Consent is involuntary where it is the result of official coercion, intimidation, or deception. *People v. Perez*, 288 Ill. App. 3d 1037, 1046 (1997). A finding that a consent to search was voluntary will not be reversed unless it is against the manifest weight of the evidence. *People v. Wall*, 2016 IL App (5th) 140596, ¶ 15.

¶ 47 Relevant factors in deciding whether consent was involuntary include whether "(1) the arrest occurred late at night; (2) the officers made the arrest while displaying weapons; (3) the arrest was made by forcible entry or the use of force; (4) the defendant was handcuffed or kept in close restraint; (5) the officers gained a key or similar means of entry during a search incident to arrest for the place they were asking to search; (6) the officers used the custody to make repeated requests for consent; (7) the custody was used for leverage, such as the officer telling the defendant that he would be released if he consented; (8) the defendant knew or was told he had the right to refuse consent; and (9) consent was obtained after the officer refused to grant the defendant's request to consult with counsel." *People v. Redman*, 386 Ill. App. 3d 409, 424 (2008); 4 W. LaFave, Search & Seizure § 8.2(b), at 65-66 (4th ed. 2004).

¶ 48    Considering the totality of the circumstances, the trial court's finding that defendant's consent was voluntary was not against the manifest weight of the evidence. "Custody alone is not sufficient to render a consent involuntary." *Id.* Although the deputies held defendant in custody for some time, there was no evidence that doing so was a subterfuge to coerce his consent. As defendant concedes, the deputies had probable cause to arrest him. They could have simply taken him to jail but refrained from doing so while they pursued their investigation. The trial court found that defendant was not handcuffed and that he was not forcibly taken into custody.

¶ 49    Although Hain apparently asked defendant repeatedly whether he would consent to a search, the trial court found, based on Hain's testimony, that defendant never specifically refused to consent, but only wanted to speak to Andrea before deciding. That testimony was corroborated by the fact that they took defendant to his house and let him speak to Andrea. The two conversed for 10 to 15 minutes. The deputies moved away to allow them to speak privately and answered their questions.

¶ 50    Hain testified that he truthfully told defendant that if he did not consent, Hain would apply for a warrant. Even accepting defendant's version of the conversation, Hain merely embellished (by negative implication) the consequences of not consenting. According to defendant, Hain said that if defendant consented, they would not disturb his children, turn the house "upside-down," or arrest him that night. These statements turned out to be true. As discussed previously, if the deputies had had to wait for a warrant, they would have had to remove the children from the house. After defendant signed the consent form, the deputies obtained the cannabis and paraphernalia rather quickly, without the necessity of removing the children. If the deputies had to search for the contraband, they would have undoubtedly disturbed the house to a much greater extent than they did when defendant led them to the contraband. And, as far as the record shows, the deputies

apparently kept their promise not to immediately arrest defendant. Thus, even by defendant's own testimony, the deputies truthfully answered his question about what would happen if he did not consent.

¶ 51 As discussed previously, the deputies did not illegally enter the house before defendant signed the consent. Their entry was reasonable, and its purpose was disclosed to defendant beforehand. There was no evidence of coercion or deception as there was in *People v. Purchase*, 214 Ill. App. 3d 152 (1991). There, the defendant's wife was home alone when two officers came to her door. One of them, noting that she was pregnant, told her that if she did not cooperate, they would put her in jail and take her baby. The officer asked her to sign a piece of paper. When she asked what it was, he stated that it merely showed her cooperation, although it was actually a consent to search. The officers also led the wife to believe that they had a valid search warrant. *Id.* at 153.

¶ 52 In *Anthony*, an officer randomly approached the defendant on the street and asked if he would consent to a search of his person. The defendant did not verbally respond, but merely " 'assumed the position.' " *Id.* at 198. The court found that the defendant did not consent but merely acquiesced to the officer's apparent authority. *Id.* at 203. Here, there was no issue of nonverbal consent; defendant signed the consent form. Accordingly, the trial court did not err in finding that defendant's consent was voluntary.

¶ 53                                    III. CONCLUSION

¶ 54 The judgment of the circuit court of Kane County is affirmed.

¶ 55 Affirmed.